UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Terrence Sampson,<br><br>                    Plaintiff,<br><br>          - against -<br><br>International Union of Operating Engineers Local 14<br>and 14B<br><br>                    Defendant. | CV    (  )(  )<br><br>Complaint and Jury Demand |

Plaintiff, by his attorney, Michael G. O'Neill, for his complaint, alleges as follows:

## Background

1.      This is an action to remedy race discrimination in employment and retaliation for opposing that discrimination by a powerful labor union in the construction industry in New York City.

2.      Jurisdiction is by virtue of 28 U.S.C. §1331, 28 USC §1343, 28 U.S.C. §1367, 42 USC §1981 and 42 USC §2000e et seq.

3.      Venue is proper because defendant International Union of Operating Engineers Local 14 and 14B (the "Union," "Local 14" or "defendant") is a resident of the Eastern District of New York.

4.      Plaintiff is African American.

5.      Local 14 is a Labor Organization within the meaning of 42 USC §2000e(d).

6.      Local 14 is the collective bargaining representative of a class of workers

who operate various types of heavy equipment in the construction industry within New York City, including Cranes, Excavators, Bulldozers and related categories of equipment.

7.      The individuals represented by Local 14 are known in the industry as "Operating Engineers."

8.      During all relevant times, plaintiff has been an Operating Engineer and a members of Local 14.

9.      There is a long history of discrimination against African Americans in the construction industry.

10.      Despite previous attempts at eradicating the effects of past discriminatory practices, the membership of Local 14 remains predominantly non-African American.

11.      The vast majority of Local 14 members are non-African American.

12.      The wages of Operating Engineers are usually the highest at any given construction site.  Base hourly rates range from $35 on the low end up to over $75 on the high end, depending on the type of equipment operated.  Night, weekends, holidays and overtime hours are paid at premium or double time.  The value of benefits is about 50 percent of the base wage rate.

13.      Contractors rarely hire Operating Engineers directly.  For the most part, contractors rely on defendant to assign Operating Engineers to their construction projects.

14.      Defendant operates what it calls a "referral hall."

15.      Ostensibly, the purpose of the referral hall is for out of work Operating

Engineers to assemble and be referred by defendant to job openings reported by contractors.

16.     As a practical matter, however, most Operating Engineers never report to the referral hall but obtain jobs from defendant by other means.

17.     This is especially true for the best jobs, which are multi-year jobs at large construction projects.

18.     The job assignment system operated by Local 14 is entirely rigged.

19.     The premium jobs, that is to say, the jobs on long term construction projects, do not appear suddenly or randomly.

20.     A large construction project involves a lot of planning.  The contractor knows weeks, sometimes months, in advance when actual construction will start and when Operating Engineers will be needed at the worksite.

21.     Furthermore, the contractor knows with some accuracy how long the construction project will last.

22.     In order to request Operating Engineers from Local 14, the contractor calls the Business Representative assigned to the region where the construction project is taking place.

23.     The contractor informs the Business Representative what machines will need Operating Engineers, when the work will start, and how long the work will last.

24.     The Business Representative will then plan which Operating Engineers are to be assigned to these projects.

25.     There are at least three ways that the Business Representative can

ensure that a particular Operating Engineer is assigned to a particular job.

26.     The first and most blunt approach is simply to instruct the contractor to request the Operating Engineer by name.  This creates a record that makes it appear that the contractor and not the Union made the decision to hire the Operating Engineer in question.

27.     Second, the Business Representative can hold the job request until the Operating Engineer he wants to obtain the job is the next Engineer to be assigned at the Referral Hall.

28.     Third, the Business Representative can assign the Operating Engineer directly to the job and bypass the Referral Hall altogether.

29.     The communications between contractors and Business Representatives is always by phone or in person.  There is no system for keeping track of when or how contractors request Operating Engineers.  In this manner, the timing and filling of requests for Operating Engineers can be manipulated to suit the purposes of the Business Representatives and Local 14.

30.     Every construction job comes to an end eventually.  In theory, this would mean that every Operating Engineer becomes unemployed at one time or another.

31.     There are tricks and techniques used by Local 14 to ensure that certain Operating Engineers have the most continuity of employment.

32.     For example, a three year job may have five or six months left of work. At that time, a new project comes online that is planned to last at least two years.  The Operating Engineer at the job that is winding down will be told to quit that job, and

shortly thereafter (if not immediately) he will be assigned to the new project, thus ensuring uninterrupted employment for two more years.

33.      Union's by-laws require Operating Engineers to report the starting and stopping of all employment.

34.      Thus, at any given time, the Union knows who is employed and who is available for employment.

35.      Due to the manner in which the industry operates, out of work Operating Engineers have no way of knowing what specific jobs are available.

36.      That information is typically known only to the Union's Business Agents.

37.      Operating Engineers who wish to be referred to jobs by the Union are supposed to sign in at the referral hall operated by the Union.

38.      The act of signing in at the referral hall is the functional equivalent of applying for employment for any available jobs within the skill set of the Engineer.

39.      Like most Operating Engineers, plaintiff is dependent upon the Union to be assigned jobs, and hence, his livelihood.

40.      During all relevant times, the Union has discriminated against plaintiff in the assignment of jobs on account of his race.

41.      Plaintiff has never been assigned by the Union to a multi-year job at a major construction site.

42.      The longest job that plaintiff has ever been assigned to is operating a locomotive in a tunnel.  This is a dirty, highly undesirable job in awful working conditions

that is disproportionately assigned to African Americans.

43.     During the same period, numerous similarly situated non-African Americans have been assigned by the Union to a multi-year job at major construction sites.

44.     Plaintiff is not assigned work by business agents without having to sign in at the referral hall.

45.     During the same period, numerous similarly situated non-African Americans have been assigned work by the Union without having to sign in at the referral hall.

46.     Before about October, 2019, jobs at the referral hall were supposedly assigned on a first come, first serve basis.  Accordingly, plaintiff almost always arrived at the referral hall long before it opened at 6:00 a.m.

47.     Often, plaintiff arrived the night before and slept in his car in order to be the first to sign in at the referral hall and enhance his chance of being assigned work.

48.     In around October, 2019, the Union changed its referral system so that engineers who arrived at the referral hall at or about opening time were supposedly chosen at random for jobs.

49.     Under either system, plaintiff has almost always been assigned jobs on low paying machines or short term jobs, while non-African American Operating Engineers who sign in after plaintiff are assigned better jobs.

Plaintiff's Administrative Remedies Are Exhausted By Plaintiff's
Reasonably Related EEOC Charge and Federal Action

50.     In 2017, plaintiff filed a charge of race discrimination against the Union with the United States Equal Employment Opportunity Commission.

51.     Among other things, plaintiff's EEOC charge complained about the discriminatory practices of the Union described above.

52.     On about July 26, 2019, the EEOC issued its right to sue letter to plaintiff with respect to the charge of discrimination filed by him against the Union.

53.     On about August 29, 2019, plaintiff commenced an action against the Union in the United States District Court for the Eastern District of New York (the "First Action.")  The civil action number of the First Action is 19-cv-04946-DG-RER.

54.     The First Action is still pending.

55.     The First Action alleges causes of action for discrimination and retaliation under Federal, State and Local laws.

56.     The factual basis for the First Action are the same discriminatory practices of the Union described hereinabove.

57.     This action is based on the discriminatory practices of the Union described hereinabove.

58.     To the extent that this action alleges unlawful retaliation, such allegations are based on retaliation for plaintiff having filed the EEOC charge and the First Action.

## Facts

59.        After plaintiff filed the First Action, the Union's discriminatory practices against plaintiff intensified.

60.        The Union's step up in its discriminatory practices is reflected in the number of hours of work that plaintiff has obtained through the Union referrals.

61.        In 2018, plaintiff worked 1,941 hours.[1]

62.        In 2019, plaintiff worked 1,414 hours.

63.        In 2020, plaintiff worked 1,215 hours.

64.        In 2021, plaintiff worked 1,011 hours.

65.        The decline in hours worked by plaintiff is not due to any changes in the construction industry or the pandemic.

66.        Records subpoenaed from the Fund in the First Action show that White members with the same skills as plaintiff have consistently worked about twice as many hours as plaintiff.

67.        The Union's discrimination and retaliation against plaintiff is also reflected in the number of times that plaintiff has attended the referral hall looking for work.

68.        Since a member attends the referral hall when out of work, the number of attendances is a proxy for the length of jobs assigned by the Union to that member.

69.        Records produced by the Union in the First Action show that, between

---

[1]        Based on records from plaintiff's pension fund.  Due to the manner in which the fund operates, hours reported in a calendar year are actually earned from November 1 of the previous year to October 31 of the calendar year.

2014 and 2019, comparably skilled White members attended the referral hall an average of 12 times a year.

70.     The same records show that comparably skilled Black workers attended the referral hall an average of 23 times a year.

71.     In 2018, plaintiff attended the referral hall 115 times.

72.     In 2019, plaintiff attended the referral hall 126 times.

73.     In 2020, plaintiff attended the referral hall 117 times.

74.     In 2021, plaintiff attended the referral hall 113 times.

75.     To date in 2022, plaintiff has attended the referral hall 72 times.

76.     Plaintiff is attending the referral hall anywhere from 8 to 10 times more than comparably skilled White workers and receiving much less work.

77.     Plaintiff is receiving so few hours of work that he no longer qualifies for medical benefits.

78.     The Union is starving plaintiff to punish him for bringing the First Action and as a warning to other Union members not to do the same.

79.     Unless this Court orders Local 14 to implement a system for assigning jobs to Operating Engineers that cannot be manipulated, the discriminatory practices complained of herein will continue into the future, to the detriment of plaintiff and other African American Operating Engineers.

## First Claim

80.     After plaintiff filed the First Action, Local 14 has discriminated against plaintiff on account of his race in the assignment of jobs in violation of 42 U.S.C. §2000e et seq.

81.     By virtue of the foregoing, plaintiff has suffered damages.

## Second Claim

82.     After plaintiff filed the First Action, Local 14 has discriminated against plaintiff on account of his race in the assignment of jobs in violation of 42 U.S.C. §1981 et seq.

83.     By virtue of the foregoing, plaintiff has suffered damages.

## Third Claim

84.     After plaintiff filed the First Action, Local 14 has discriminated against plaintiff on account of his race in the assignment of jobs in violation of the New York City Human Rights Law.

85.     By virtue of the foregoing, plaintiff has suffered damages.

## Fourth Claim

86.     After plaintiff filed the First Action, Local 14 has retaliated against plaintiff for opposing Local 14's discriminatory employment practices and for participating in administrative and legal proceedings, in violation of 42 U.S.C. §2000e et seq.

87.     By virtue of the foregoing, plaintiff has suffered damages.

## *Fifth Claim*

88.      After plaintiff filed the First Action, Local 14 has retaliated against plaintiff for opposing Local 14's discriminatory employment practices and for participating in administrative and legal proceedings,  in violation of 42 U.S.C. §1981 et seq.

89.      By virtue of the foregoing, plaintiff has suffered damages.

## *Sixth Claim*

90.      After plaintiff filed the First Action, Local 14 has retaliated against plaintiff for opposing Local 14's discriminatory employment practices and for participating in administrative and legal proceedings, in violation of the New York City Human Rights Law.

91.      By virtue of the foregoing, plaintiff has suffered damages.

92.      WHEREFORE, plaintiff demands judgment for all relief permitted by law, including but not limited to:

a      Awarding plaintiff money judgment for his damages, including but not limited to lost wages, lost benefits, front pay, other economic damages, shame, humiliation, embarrassment and mental distress;

b      Awarding plaintiffs punitive damages;

c      Awarding plaintiffs attorneys' fees;

d      Awarding pre-verdict, post-verdict and prejudgment interest and costs;

e      Granting preliminary and permanent injunctive relief by ordering Court oversight of the Union's referral practices in order to ensure that jobs are not assigned on a discriminatory basis;

f      Granting such further and additional relief as the Court deems just and appropriate under the circumstances.

Dated: New York, New York
         June 17, 2022

MICHAEL G. O'NEILL

_____

Attorney for Plaintiff
217 Broadway, Suite 306
New York, New York 10007
(212) 581-099

# Jury Demand

Plaintiff demands trial by jury on all issues.

Dated: New York, New York
         June 17, 2022

MICHAEL G. O'NEILL

_____

Attorney for Plaintiff
217 Broadway, Suite 306
New York, New York 10007
(212) 581-0990