UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Terrence Sampson,<br><br>    Plaintiff,<br><br>  - against -<br><br>International Union of Operating Engineers Local 14 and 14B<br><br>    Defendant. | 19 CV 4946-LDH-SMG<br><br>Declaration of Shane Thompson, Ph.D. |

Shane Thompson declares under penalties of perjury that the following statements are true and correct to the best of his knowledge, information and belief.

1. I am a forensic labor economist, with a Ph.D. (2013) and M.A. (2009) in economics from University of Arizona and a M.S. (2007) in economics from Utah State University. I am the chief economist and founder of Precision Analytics Co, LLC (Precision Analytics), a quantitative consultancy in Castle Rock, Colorado.

2. I was retained in this action to perform statistical testing on data relating to the International Union of Operating Engineers Local 14 and 14B's (the "Union") operation of its referral hall (the "Hall") in order to determine whether race was a factor in its referral of jobs in general and specifically in relation to the plaintiff. I was subsequently retained in a related lawsuit for the same purpose and also to determine whether the Union's referral of jobs to plaintiff evidenced retaliation.

3. The purpose of this declaration is to respond to arguments raised by defendant in support of its Daubert motion.

4. As I understand it, defendant does not challenge my qualifications as a forensic labor economist or the statistical tests that I used in my analysis, and I can state unequivocally that the tests and methods that I used are all conventional and regularly used and accepted in the field of statistics. What defendant appears to challenge is how I used those statistical tools, in particular the fact that I did not incorporate data from a "skips and refusals" table in my work. As such, defendant is really challenging decisions I made in designing my regression. This is an important point, because there are often many ways to analyze a problem, and disagreements among statisticians generally boil down to opinions about the accuracy of one analysis over another. I recognize that Dr. Bradley is of the opinion that my results are not accurate. I disagree with Dr. Bradley and am fully confident that my analysis is accurate and completely defensible.

5. As explained in my report, my work begins with a null hypothesis, in this case, that race is not a factor in the Union's referral of jobs. If it were the case, we would expect certain results from statistical testing. If the actual results deviate from the expected results, we measure that deviation and if there is a less than 5 percent probability that the deviation would occur by chance, we conclude that null hypothesis is false.

6. In order for the testing to be reliable, we must exclude other factors that might explain why the results differ from the expected. We refer to that process as "controlling" for those other factors. Thus, in formulating our tests, we must consider what non-discriminatory factors determine whether a job is referred to a union member. In this case, this is a very simple task: under the Union's referral rules, jobs are assigned

to the next eligible member present at the Hall. A member is eligible for the referral if he or she possesses the necessary skill, certification or license (collectively, "certifications") needed for the job. The member is "next" if he or she is at the head of the list of members at the Hall.

7. During the time frame covered by the two litigations, the Union used two different methods for preparing the list of members at the Hall to be used for referrals. Initially, the list reflected the order in which members arrived and signed in at the Hall, therefore a "first come, first served" process. Later, the Union randomized the names of the members who had signed into the Hall, so that the order of arrival was no longer a factor. My analysis assumes that both processes are race neutral, meaning that the process which is used is irrelevant for my purposes.[1]

8. Accordingly, the number of referrals that a member would receive depended on just two variables: the number of times the member went to the hall and the certifications held by the member. Both factors are highly objective and readily lend themselves to measurement and therefore control. As my reports discuss, I compared plaintiff only against other members with the same certifications held by plaintiff, or a subset thereof. I refer to these comparators as his peers. Since no peer held a certification not held by plaintiff, any disparity in the number of referrals between plaintiff

---

[1] It is my understanding that when the first come first served method was in effect, the first members to arrive were heavily weighted toward minorities, that is, not race neutral. I have confirmed that to be the case, although I have not measured that or taken it into consideration. Since we would expect that being amongst the first to arrive at the Hall would result in more referrals for the early arrivers, not incorporating that data into my analysis means that it *understates* the discrimination against Blacks. By the same token, changing the method of constructing the list to be used for referrals actually punished the early arrivers and therefore had an adverse impact upon Black members.

and his comparators could not be attributed to certifications.

9. Since plaintiff complained not just about the number of referrals he received but about the quality of those referrals, it was necessary to determine how to measure the quality of jobs. There are two primary factors that relate to the quality of the job: its length and its rate of pay. The Union has no data that directly tracks the length of jobs held by members, so it was necessary to explore whether there was data that could serve as a proxy. I used two sets of data for this purpose. First, I used data from the Union's benefit funds that reflected the total number of hours worked by the member in a given period. Second, since a member who is actively employed does not attend the Hall, it stands to reason that the number of times a member appears at the Hall is related to the length of the jobs that the member receives. For example, if there were 200 work days in a given period and a member attended the Hall 150 times and received 50 referrals, it is obvious that the average length of his or her jobs was 1 day.

*Skips and Refusals*

10. Defendant argues that my reports are unreliable because I did not control for members skips and refusals. Defendant is wrong. There are a number of reasons why the skips and refusal data should *not* be considered in an analysis of the Union's job referrals.

11. As explained by defendant in its motion, skips and refusals are two different things. A refusal is when a job is offered to a member and the member declines to accept the referral. A skip is any time that a job is not referred to the next member on the list for any number of reasons. Since these are distinct and separate events, they

should be recorded in different tables.

12. Putting this aside, the logic underlying defendant's argument would appear to be that a skip or refusal reflects the Union's attempt to refer a job to a member, and therefore the non-referral represented by the skip or refusal should not be counted against the Union.

13. This is an appropriate juncture to comment on the fact that defendant did not provide any hard facts or evidence in support of its motion. In order to maintain that a regression analysis omits an important variable, it is necessary to show why that variable is important and what the effect of that omission is.

14. Defendant relies entirely on the report of its expert, Dr. Bradley. This amounts to little more than Dr. Bradley's say so. It is true that defendant points out that Dr. Bradley's report (for the first period of time only) states that when he purported to control for skips and refusals the discrimination effect vanished, but Dr. Bradley's work in this regard was so deficient as to be meaningless. I will explain.

15. Dr. Bradley used defendant's Skips and Refusals table as is, and in doing so, incorporated several major infirmities in that data. I can identify three that are self-evident.

16. First, the Skips and Refusals data incorporates skips based on not having the necessary certification. Recall that the rule regarding referrals is that the referral goes to the next qualified member on the list. If the member lacks the certification for the job, he or she is not qualified, and therefore the skip does not represent an attempted referral by the Union.

17. Second, a skip or refusal does not disqualify a member from receiving a referral for the next job that comes along. There are many skips or refusals where the skipped member was given a different job. For example, defendant's Skips and Refusals table reflects a skip for plaintiff on September 25, 2019. Plaintiff, however, was referred the same day for a different job, therefore that skip did not have any effect on plaintiff whatsoever. By controlling for that skip, however, Dr. Bradley was in effect using that skip to explain why plaintiff received the number of referrals that he did.

18. Third, there are numerous instances of multiple skips or refusals on the same date. An example is July 31, 2019, when plaintiff is shown to have been skipped for two jobs. Since a member can only accept one referral on any given date, by controlling for both skips, Dr. Bradley is exaggerating the impact of those skips. In addition, on that particular date, plaintiff was assigned a different job, so neither skip should have been used by Dr. Bradley in his analysis.

19. There are other problems with the data that are not as self-evident. For example, the reason given for many skips is "experience." This does not tell us whether that is a certification issue, the judgment of the member himself, or is the judgment of the business agent. It makes a difference, particularly if it is the judgment of the business agent. I will come back to this below.

20. Thus, Dr. Bradley's use of defendant's data "as is" was a huge blunder and renders his conclusion worthless. Since defendant cannot rely on this analysis to demonstrate the materiality of the Skips and Refusals data, it is left with nothing more than the argument of its attorneys. I submit that proves nothing.

21. There is another, less obvious but more important, reason why the Skips and Refusal Data should not be used. It is a fundamental tenet of labor economics that individuals are presumed to act in their self-interest. When behavior is observed that seems to be contrary to one's self-interest, it is important to ask why. Needless to say, self-interest is race neutral.

22. In this case, Union members go to the Hall to receive work. Refusing work is contrary to that purpose. This is especially true in the case of plaintiff. The data shows that he was often the first or among the first to arrive at the Hall when the rule was first-come first-serve. I understand that this would entail arriving at the Hall at 4 a.m. or even spending the night in his car. This is the behavior of someone who wants work, and if he refuses a job that is offered to him, there must be a reason.

23. The most obvious reason would be the quality of the job. This could be due to the length of the job or the rate of pay or something else that makes the job undesirable.

24. It is important to keep in mind that one of the allegations in this case is that Blacks in general and plaintiff in particular are given low quality jobs, jobs of short duration or low pay. If that were true, one would expect that the rate of refusals would be higher among Blacks. Therefore, if true and if refusals were controlled, i.e., used as an explanation for the disparity in job referrals, it would mask the effect of race, because race is a factor in why jobs are refused.

25. The data supports this conclusion. Blacks represent about 16 percent of Hall attendance, but 35 percent of refusals. Whites, on the other hand, represent 75

percent of Hall attendance but only about 47 percent of refusals. Because of this disparity, it is simply a matter of the application of statistical formulae that controlling for refusals will ameliorate or completely erase the effect of discrimination against Blacks. This proves nothing, and simply begs the question: why do Blacks disproportionately refuse jobs?

26. This is not all. There is a critical difference between how referral data and skips and refusal data is collected by the Union. When a business agent refers a job, he writes the particulars of the job on a two-part paper form. One copy is given to the member, and the other is given to the office and inputted into the computer by office staff. There is a paper record of the referral as back up in case the computer data is questioned.

27. In contrast, business agents enter skip and refusal data directly into the computer. There is no control to this process, no back up, and the member is not informed. It is entirely within the control and discretion of the business agent, and the member has no ability to challenge the information, if he or she is somehow even made aware of it.[2] In other words, the reliability of the skips and refusals data depends entirely on the business agents, who are the same individuals accused of using race as a factor in job referrals. Thus, the disproportionate number of refusals by Blacks could simply reflect a tendency by the business agents to make more entries in the case of Blacks than in

---

[2] My review of the Union's data shows that there are numerous "out of order" referrals that are not noted in the computer system as a skip or a refusal. This shows that the computer system does not require a skip or refusal to be entered into the system.

Whites.

28. Recall that I queried whether the "experience" rationale for a skip was the judgment of the business agent. If so, that would be another reason to disregard those entries, because they would be subject to the same discriminatory conduct that we are trying to isolate.

29. In sum, the skips and refusal data is subject to the same discriminatory conduct that we are trying to measure in the case of referrals. Thus, that data cannot be used as an explanation for the disparity among Blacks and Whites in the referral data.

*Random Job Assignments.*

30. Defendant argues that my report is unreliable because it refers to job assignments as not being random. Random in this context (i.e., in my report) refers to a disparity that cannot be explained as occurring randomly, all things being equal. In this case, all things being equal means controlling for hall attendances and certifications, which are the two principal factors that are supposed to account for job assignments.

31. I don't know if defendant is seriously contending that my report assumes that job assignments are randomly given. One need only read my reports to understand the use of the term random in my report. A regression that uses controls by definition assumes that the events being investigated are not random, because the control is a factor that affects the event. In this case, for example, I controlled for certifications, which plainly acknowledges that the assignments are not random because they are affected by certifications.

32. Race is not supposed to be a factor, however, so we would expect to find

race randomly distributed, i.e., in a manner that is within 95 percent probability of happening by chance. That is what random means in the context of my report.

*Contractor Complaints About Plaintiff.*

33. Defendant discusses contractor complaints about plaintiff and requests by contractors that he not be assigned to them as explanations for plaintiff's referral data. This information is not useful, because defendant did not provide similar information for other members.[3] It is impossible to do a regression analysis with data for one member of a group. This is pretty basic, because we are comparing plaintiff's experience with other members (his peers). Furthermore, defendant's data shows that notwithstanding these letters, plaintiff has been assigned to work for some of those contractors after the issuance of the letters.

*Information from Plaintiff's Attorney.*

34. I do not understand defendant's objection to my receiving background information from plaintiff's attorney. It is routine for attorneys to provide an expert with facts. For example, how does it matter if the attorney tells me which machines have higher pay rates than other machines, or how the benefit stamp redemption system works? Is defendant seriously suggesting that plaintiff's attorney should provide me with the underlying documentation and depositions and tell me to figure it out myself?

35. I note that defendant does not contend that any of the information I received was inaccurate or that it somehow altered the results of my statistical work.

---

[3] Dr. Bradley in his first report asserts that complaints from contractors cannot be quantified for purposes of a regression analysis. I disagree. This type of data could be quantified in any number of ways, and it is something that labor economists such as myself often do.

*Supporting Documentation for my third report.*

36. I also do not understand defendant's criticism about it supposedly not receiving the documents used in my third report. My third report was to rebut the criticisms made by Dr. Bradley and did not involve any new data or statistical testing. There was simply nothing to provide.

*The effect of new data*

37. Defendant points out that I testified that new data (e.g., skips and refusals) might lead to new results. This is a truism. Every statistical expert would have to agree that new data, if relevant, *could* lead to different results. That establishes nothing.

*Opining on "authenticity" of evidence.*

38. Defendant argues that I am not qualified to determine if data is unreliable or corrupted. I disagree. In my rebuttal report, I demonstrated how the Union's skip and refusal data regarding plaintiff could not be true. My analysis was correct, and the Union submitted an affidavit from its computer technician acknowledging that the table that had been produced was erroneous. I have never been provided with a corrected table, nor do I understand how the error in the table (incorrect dates) could have been introduced merely by copying the data from one database to another.

39. Examining data for integrity and inconsistencies is a critical part of my work. Dr. Bradley emphatically disagrees, and that is his opinion, but I have shown how his indiscriminate use of the skips and refusal data renders his conclusion with respect to the effect of that data on job referrals as meaningless.

40. Defendant complains because I stated that Dr. Bradley's proposed omitted

variables do not make sense. I am qualified to make that judgment. For example, Dr. Bradley suggested marital status as a possible variable. Business agents do not take marital status into consideration when giving referrals; therefore, it does not make sense to control for it. If his theory is that it might affect hall attendance, this is theoretical and abstract, and it is not relevant because we are looking only at members who attended the hall, not why they did nor did not attend.

41. Defendant cites other paragraphs in my supplemental (third) report, which it claims contain statements I am not qualified to make. I explained in my report the basis for those statements and I stand by them. Although defendant characterizes those statements as questioning the "authenticity" of defendant's records, that is incorrect. Those statements respond to criticisms by Dr. Bradley and his report. The only evidence I questioned was the skip and refusal data, which defendant acknowledges to have been incorrect.

42. Defendant distorts the meaning of my testimony that the skips and refusal data "could potentially take away from the effects and bias the effects that we are seeing on race." As explained above, the skips and refusals data contains a disproportionate number of refusals by Blacks. That discrepancy would mask the *true* effect of discrimination in job referrals. That is what I meant by the above statement, which I think is clear if it were read in context. What defendant quoted was just part of my answer to the question by defendant's attorney.

43. Defendant argues that my assumption that member certifications were static during the entire period renders my report unreliable, and that I should have

accounted for certifications acquired or expired during the relevant period. That is not true. Keep in mind that peers were defined as members who did not have any certifications that plaintiff did not have and had only the same certifications as plaintiff or a subset of them. Assuming that a peer had a certification which he or she did not have for part of the time in question would not affect their status as a peer, because it would not result in that person having a certification that plaintiff did not have.

44. It is interesting that defendant originally criticized my report for assuming that plaintiff's certifications were constant during the relevant period. Dr. Bradley asserted that plaintiff's forklift certification had expired. Dr. Bradley was wrong, however; plaintiff's forklift certification had been renewed and defendant had a copy of his renewal in its records. Having failed on that criticism, defendant now criticizes the assumption regarding plaintiff's peers, but that criticism is without merit as discussed.

*Benefit Funds Records*

45. This is another criticism that has made a 180-degree turn. Initially defendant argued that my reports were not reliable because I did not use the benefit funds records. That was false, and it was obvious all along that I had used the benefit fund data. Now defendant argues that actually using that data makes my reports unreliable.

46. The benefit funds maintain a record of the hours worked by Union members. According to defendant, the benefit fund data should not have been used, because they do not differentiate between hours worked on jobs referred by the Union and jobs that members found themselves.

47. Although the Union does not maintain a record of hours worked by its members, it does keep a record of jobs worked by its members and how the member obtained the job. This is the only record available regarding jobs that members find themselves.

48. Defendant apparently assumes that any hours in the Funds database that cannot be explained by the record of jobs maintained by the Union necessarily represent jobs that members found themselves. There is no evidence to support this assumption other than defendant's mere say so.

49. One of plaintiff's allegations is that the Union arranges jobs for its members outside of the referral hall, which defendant denies. In any event, there are three possible sources for the hours in the Funds' records: referrals by the Union at the Hall, jobs arranged sub rosa by the Union, and jobs members found themselves. Two sources are Union influenced, and the third is not.

50. Even though we cannot isolate the data regarding members who find their own jobs, my analysis assumes that it is race neutral. If members can find more, or better, work on their own than relying on the Union, then there is no reason to believe that White members would disproportionately use this method for obtaining work, while Black workers would be more content to accept the inferior jobs from the Hall. Such a suggestion defies logic, and I have no data to indicate that it is true. Race-neutral data does not affect the regression analysis, because it is not a causative factor and therefore cannot explain the disparities found in the data.

51. Defendant's motion ends with a reductio ad absurdum argument which

postulates a member who attends the hall 1000 times and refuses 900 jobs compared to a member who attends the hall 200 times and refuses 100 job offers. This argument is meaningless from a statistical point of view, because we do not know what the null hypothesis is under defendant's example.

52. Even if I fill in the blanks for defendant, defendant's argument depends on the postulated facts being both accurate and the entire universe of relevant facts. Such an example is not relevant to this case, because we know that defendant's skips and refusals data contains multiple entries for the same date, entries for refusals that did not result in loss of work, and skips because of certification issues, as well as the stark and unexplained disparities in the refusals by Blacks compared to the refusals by Whites. To use defendant's example, if the 900 refusals were because the jobs offered required a license that the member did not have, the outcome would be completely different.

Dated: March 3, 2025

_____
Shane Thompson, PhD